Filed 5/6/15  P. v. Rankin CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B252821 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA329452) |
| v. | |
| SHAWN L. RANKIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Sam Ohta, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and David Zarmi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Shawn L. Rankin of two counts of forcible rape (Pen. Code, § 261, subd. (a)(2))[1] (counts 5, 6) and one count of forcible oral copulation (§ 288a, subd. (c)(2)) (count 7).[2] The jury found that in the commission of the offenses, defendant committed two or more sex offenses against more than one victim in violation of section 667.61, subdivision (e)(4).

Pursuant to the one-strike finding, the trial court sentenced defendant to 15 years to life in counts 5 and 6, to be served consecutively. The court imposed the high term of eight years in count 7, to be served concurrently.

Defendant appeals on the grounds that: (1) the trial court's response to the jury's notice of deadlock resulted in a coerced verdict and deprived him of his rights to due process and a jury trial; (2) section 261.6 and CALJIC No. 1.23.1 violate due process by creating a presumption that a victim has not consented unless she positively cooperates in the sexual acts alleged; (3) the trial court committed prejudicial error in failing to provide the jury with optional instruction on withdrawal of consent given the testimony of defendant's former girlfriend; (4) defendant's convictions should be reversed due to the trial court's admission of prior sexual offense evidence under Evidence Code section 1108; (5) defendant's conviction should be reversed because consideration of the uncharged offenses as propensity evidence under Evidence Code section 1108 deprived him of equal protection and his due process right to a fair trial; (6) defendant was deprived of his due process right to a fair trial as a result of the erroneous admission of other sex offense evidence to show common plan or scheme; (7) the trial court committed prejudicial error in refusing to take judicial notice that defendant had pleaded guilty to sexual battery in one of the uncharged acts; (8) CALJIC No. 2.50.01 interfered with the presumption of innocence and defendant's right to have the jury make a determination of guilt upon proof beyond a reasonable doubt; and (9) if the court finds any of the

---

[1] All further references to statutes are to the Penal Code unless stated otherwise.

[2] The jury acquitted defendant of the 1997 murder (count 1), rape (count 2), penetration by a foreign object (count 3), and torture (count 4) of Wyesser Ann Cook.

2

instructional or evidentiary arguments forfeited, trial counsel provided ineffective assistance.

## FACTS[3]

**Prosecution Evidence**

### *K. W. (Count 5)*

On May 6, 2001, at 10:00 p.m., K. W. was standing at a bus stop near the intersection of Crenshaw Boulevard and Vernon Avenue. K. had drunk a bottle of wine and was carrying a second one. A man began talking to her from his car. He drove a Durango SUV and asked K. if she needed a ride. K. accepted the ride, since she often accepted rides from strangers. Prior to that date, she had never had a bad experience doing that.

Defendant began driving K. home in the direction that she told him. He then said he had to tell his wife he was driving K. home. He continued driving away from the direction of her home. He eventually parked at the curb near an apartment building.

K. recalled that she was in the back seat and defendant got in the back seat. K. asked him why he was there. Defendant grabbed her by the neck and began choking her and pulling her to him. K. almost lost consciousness. When she could breathe again, she said, "Please don't kill me." Defendant said something that K. did not remember and ripped off her pants. The pants and K.'s shirt were shown to the jury.

Defendant told K. to do as he said. He proceeded to have sexual intercourse with her, although she did not want to. She was too afraid to resist. She told him, "no" several times. Defendant told her to act as if she liked it. After defendant finished, K. reached for the door, which was unlocked. She got out of the car, leaving behind her purse and alcohol. K. ran screaming toward some nearby apartments. A woman helped her and gave her a blanket to cover up. The police came and took her for an examination. She later received her identification and Social Security card in the mail.

---

[3] The factual summary omits evidence related to counts 1 through 4, which charged defendant with the crimes against Wyesser Ann Cook, since defendant was acquitted of all of those counts.

3

Angeline Sims heard loud cries coming from the grassy area in front of her condominium. She saw K. running and screaming. Sims went outside and saw that K. was "half-clothed" and appeared scared. The police arrived and spoke to them. Another neighbor, Gail Oliver, had been driving home when she noticed an SUV parked in a dark area near a closed nursery. She heard a woman screaming a couple of minutes later.

Elizabeth Tighe examined K. at the rape treatment center at Santa Monica hospital. Tighe saw redness to the neck and a laceration on the left breast. Tighe collected swabs from different parts of K.'s body. The swabs and K.'s clothing were turned over to law enforcement.

On April 15, 2002, Stephanie McLean, a criminalist with the Los Angeles Police Department's crime lab, analyzed K.'s rape kit. She detected spermatozoa on the vaginal sample and external genital sample. She prepared samples and sent them to a DNA laboratory.

The parties stipulated that Matthew Quartaro was employed as a DNA analyst for Orchid Cellmark. On August 9, 2002, the laboratory received items from K.'s rape kit that were submitted for DNA typing. On October 31, 2007, Quartaro received a sample from defendant. It was stipulated that "the DNA profile from the female fraction of the external genital swab . . . from K.'s rape kit [was] identified as originating from [defendant]."

### N. M. (Counts 6 and 7)

In the afternoon of April 29, 2002, N. M. was walking on Jefferson Boulevard with her two daughters, ages four and two, when a man drove up and commented on her shirt. He asked for her name. He then parked and got out. He seemed kind and respectful. He asked for her phone number after a short conversation, and she gave it to him.

Defendant offered N. a ride, and she allowed him to drive her and her children home. N. had regularly accepted rides from strangers, but that was the last time. Defendant stayed in N.'s living room for a few minutes and then left.

Defendant called N. that night. N. told defendant that she wanted cookies, and defendant asked if she wanted him to come over. He also asked if she wanted to smoke marijuana. She agreed. Her daughters were asleep when defendant arrived at 10:45 p.m. N. and defendant went into the front bedroom because the living room had no light. There was a daybed in that bedroom, and N. and defendant watched television and smoked. Defendant showed her his tattoos, which included a tattoo of a sun on his arm. Defendant told N. he owned a carpet cleaning business and "never had a record." At one point, she and defendant drove to get some cookies, leaving the children asleep in the house. When they returned, they continued smoking. N.'s daughter woke up, and N. told defendant it was time to go.

As defendant was leaving, he asked N. if he could have a kiss. At first she said "no" but then she kissed him on the cheek. She led him through the kitchen to the back door because the front door did not work. Defendant's whole demeanor changed, and he asked N. if she wanted to have sex. When she refused, he offered her $100 for sex. When N. declined again, defendant threatened to kill her with a gun.

N. froze, and defendant grabbed her around the neck and led her into the living room. Defendant pushed her onto the couch and told her to take off her clothes. When she took too long, defendant started to strangle her. N. could not breathe and did not remember if she lost consciousness. When N. was completely naked, defendant removed his pants and pulled her bandana over her eyes. Defendant asked N. to perform oral sex on him. She said, "No," and he responded, "Yeah. Yeah. You're right." He began performing oral sex on her. He stopped and began having sexual intercourse with her. Afterwards, defendant wiped N.'s body with baby wipes he found in her home.

Defendant took the cordless hand receiver from N.'s telephone. He moved N. into the room with the daybed and put her in the closet. Defendant came back to get N. because he could not open the front door. N. told him she could not open it. Defendant put her back in the closet, and she waited until she saw the lights from his car through the closet window. She came out and called 911 by using the speakerphone. She realized that the dirty baby wipes and her bandana were not in the house.

5

The police came and took N. to the hospital for examination. Nurse Danielle Blum examined her and prepared a rape kit with swabs from N.'s genitals. N. gave a police sketch artist a description of the man who raped her. N. told the artist that defendant had a bald spot behind his ear and a tattoo of the sun on his left shoulder. The sketch was shown to the jury.

On August 22, 2007, N. was shown a photographic lineup that included defendant, and she was unable to identify him. At trial, N. appeared to identify defendant in court by pointing to him when describing the perpetrator's haircut. She later stated that although she was referring to the defendant, she could not see the man who raped her in the courtroom. She said she did not recognize the defendant "the way he looks now." The man in court looked old to her. N. did not know K.

On May 16, 2002, Los Angeles Police Criminalist Meghan Cirivello prepared DNA samples from the vaginal swab taken during N.'s examination and sent them for analysis. The parties stipulated that on October 31, 2007, Quartaro examined the DNA samples taken from N. and determined that "the DNA profile from the male fraction of the vaginal swab . . . [was] identified as originating from [defendant]."

### Keisha H. (Uncharged Act)

Keisha H. was defendant's girlfriend in 1994 and 1995. At that time, defendant lived near the intersection of Avalon Boulevard and Florence Avenue in Los Angeles. They had a sexual relationship, and he never forced her to have sex with him against her will. On one occasion, they were having intercourse and she asked him to stop, but he continued. This occurred in the middle of their relationship when things were "going downhill."

### Yolanda C. (Uncharged Act)

On February 6, 2000, at midnight, Yolanda C. was walking on a street near her home in Los Angeles. Yolanda saw defendant, whom she had seen four or five times before in the neighborhood. He was sitting in a parked car. Yolanda and defendant exchanged a greeting, and she told him she needed a ride. Yolanda had smoked cocaine approximately two hours earlier. It had worn off and she was on her way to get more.

6

Defendant told Yolanda to get in.  She told him where she needed to go, but he drove to a dead-end street.  He parked and told her to get in the back seat, and she did so because she was scared.  Defendant then pulled out a gun.  Yolanda testified previously that defendant offered her money for sex and she told him that was entrapment.  She also testified previously that she told defendant she was not interested because she had somewhere she needed to go.  At trial, she did not recall her prior testimony very well.

After defendant threatened her with a gun, Yolanda said, "Please don't hurt me, do what you got to do, and let me go."  He told her to remove her clothing.  Defendant had sexual intercourse with her and then told her to put her clothes on.  He drove a bit and told her to unlock the door at an intersection and get out.  When she opened the door, he pushed her out of the car.

Yolanda saw a police patrol car and flagged it down.  She told the officers to follow defendant's truck and said, "that man just raped me."  The officers put her in the back seat of the patrol car and followed defendant.  After a chase, the officers pulled defendant over.  They showed Yolanda a toy gun they found in the car.  The police took her to a hospital where swabs were taken from her body.  Yolanda testified against defendant in court in that case.  She did not want to have sex with defendant.  She believed the gun he had was a real gun.

Yolanda acknowledged she had been convicted of forgery.

*Investigation*

Former Los Angeles Police Detective Gregory Stone began investigating defendant in connection with the crimes against K. and N. in September 2007.  Detective Stone ascertained that defendant's home was a mile and a half from the intersection of Vernon and Crenshaw and the intersection of Jefferson and Crenshaw, which were near the areas where the women were picked up.  Defendant drove an SUV at the time of those incidents.  Detective Stone met with defendant on September 26, 2007, and obtained DNA swabs from inside his cheek.

**Defense Evidence**

Defendant did not testify. The defense called two witnesses whose testimony was relevant only to counts 1 through 4, of which defendant was acquitted.

**Rebuttal Evidence**

The two witnesses called in rebuttal were also relevant only to counts 1 through 4.

## DISCUSSION

### I. Trial Court's Actions with Deadlocked Jury

#### A. *Defendant's Argument*

Defendant contends that, although the trial court made no expressly coercive remarks, its comments to the jurors when rejecting their unanimous consensus of deadlock, and its offers of assistance to reach a verdict, constituted undue coercion of the minority jurors. Defendant argues that his convictions in counts 6 and 7 must therefore be reversed. He also claims he was denied due process because the court's conduct and comments resulted in a de facto *Allen*[4] charge.

#### B. *Proceedings Below*

On the morning of April 29, 2013, the jury began deliberations anew after an alternate juror was selected to replace a juror who was ill. The jurors deliberated for the rest of the day and recessed that evening. Deliberations continued the following day, during which the jurors' request for certain exhibits was granted. Before leaving at 4:00 p.m., the jurors submitted a note saying that they had reached verdicts on all but two counts. Proceedings resumed the following day, May 1, 2013. On that morning, the third day, the court read a note from the jurors stating, "We have come to a verdict on five counts except for two. We are divided on the other two. What do we do now?" The court brought out the jurors, and the following exchange occurred:

"THE COURT: The record will reflect that the regular jurors, those that are deliberating on this case, have entered the courtroom and are now seated. So defendant and both counsel are also present. Juror No. 18, you're the foreperson; correct?

---

**4**      *Allen v. United States* (1896) 164 U.S. 492 (*Allen*).

8

"JUROR NO. 18:  Yes.

"THE COURT:  You've sent out a note, and I have it here.  It indicates, 'We have come to a verdict on five counts except for two.  We are divided on the other two.  What do we do now?'  I'm going to talk to you just a little bit here, but in talking to you, the attorneys and I are not permitted to know what the jury is discussing or thinking about or is doing in the back; so I don't want you to offer anything about what's happening back there except for the question that I seek clarification on.  All right, sir?

"JUROR NO. 18:  Uh-huh.

"THE COURT:  Is that a yes?

"JUROR NO. 18:  Yes.

"THE COURT:  Okay.  So on this case seven counts were alleged against the defendant: count 1, murder; count 2, rape; count 3, penetration; count 4, torture; count 5 and 6, again, rape; and then count 8, forcible oral copulation.  Of these counts which has the jury reached verdicts on?

"JUROR NO.  18:  On those counts.

"THE COURT:  On every single one of them?  So on which count has the jury—let me ask it in the negative then.  Which one have you not been able to reach a verdict on?

"JUROR NO. 18:  On the last two, forcible rape and oral copulation.

"THE COURT:  6 and 7?

"JUROR NO. 18:  Yes.

"THE COURT:  Okay.  So the jury has been able to reach a verdict on counts 1 through 5?

"JUROR NO. 18:  Yes.

"THE COURT:  Is that right?

"JUROR NO. 18:  Yes.

"THE COURT:  Okay.  Now, again, I don't want you to offer anything beyond what I'm asking you so don't tell me anything beyond the question I pose.  But are you saying to me in this note that you've given here that you have done all that you can on counts 6 and

9

7 and that you think that you are no longer able to proceed any further, that you are at an impasse? Is that what you're saying to me on counts 6 and 7?

"JUROR NO. 18: Yes.

"THE COURT: Okay. Now, you have asked for readback of testimony on counts 6 and 7 and you've gotten that. Is there anything else the court can do for you, like give you further readback of testimony, clarify any points of law, anything like that to assist you with respect to count 6 and 7? Is there anything else that you think the court could do?

"JUROR NO. 18: We would—

"THE COURT: Let's do this then. You're all kind of looking at each other thinking about it. Let's do this. Consider what I have just said and see if there is anything else that can be done to assist you and then let me know if you think that there's something I can do to help you or you think now because of what I said there's something more to talk about, then you ought to continue deliberating. If, on the other hand, you think there is something I can do for you to help you, then you may send out another note indicating that there's something that I can do for you. If, on the other hand, you do not think that there's anything else that can be done, then you may send out another note indicating that you're at an impasse on counts 6 and 7, and at that point I'll bring you out and have further additional discussions with you. Okay?

"JUROR NO. 18: Okay.

"THE COURT: So I'm going to ask you to go back into the deliberating room for now and we will buzz you out to allow you to go to lunch. Okay? All right."

After lunch, the jurors sent the court another note. The court stated, "They are telling me that they think they are at an impasse on those two counts. So I need to bring them out and determine whether or not they are deadlocked." The court addressed the foreperson and, after repeating the contents of the note, it stated, "I need to ask you some questions now."

The court summarized the actions taken to that point, i.e., two readbacks of testimony of the alleged victim in counts 6 and 7. The court stated, "So the trial took awhile . . . it was a month-long trial almost, not quite. But it took a little bit of time. And

10

you as a group have been deliberating since . . . Monday. . . . And let me just say that I don't know what the numerical breakdowns are, and you may truly be at an impasse. I don't know. But it isn't unusual for jurors to come to a point where it appears they are at a place where there may be firmly entrenched differences of opinion. It is not unusual for jurors to get to that point yet not truly be at an impasse. You all know what human beings are like and what human interactions are like, and that's what is going on in the back. You are all talking about something. So it's 12 people attempting to reason things out. And there are instances where jurors think that they are at an impasse, but they really are not. And you've had arguments with people where you felt that the person was of a particular mind. And then later on, they changed their mind, and things changed. So that's what I need to ascertain whether or not you are at that point where you are firmly entrenched to a degree that there isn't going to be any further changing of anyone's minds. Or if this is one where, you know, there are instances where people feel like they are at an impasse, but they are really not at an impasse and things change. So I need to make that decision here about this situation. So first of all, Juror No. 18, I'm going to talk to you as the foreperson. So I am not talking to you as an individual juror. But I am talking to you as sort of the facilitator of the discussions that have taken place in the back. As that person who served as a facilitator, do you think that if the court was to ask the jury to continue deliberating that there is a reasonable probability that the jury might be able to reach a verdict on counts 6 and 7? The question is 'reasonable probability.'" The foreperson answered, "No."

The court stated, "Okay. All right. So you consider the issue of additional readback testimony. You consider the issue of explanation on the law. There are additional things that the court could do. For example, the court could allow the attorneys to argue again. So let's say that the jury had a question, and you pose a question. And if you wanted to hear argument from attorneys, I could then turn to the lawyers and allow them to argue the case to you one more time. There are various different things that the court could do, can do. But in any event, you might not know []   [t]hat so I am just letting you know that. Does that change your mind in any way, Juror

11

No. 18, or are you still as the facilitator the person who served as the foreperson still of the mind that there is no reasonable probability that the jury could reach a verdict on 6 and 7?"  The foreperson answered, "No."

The court stated, "Okay.  That's fine.  Now I am going to go through the group individually.  And I am not asking you as a group now because each juror is duty-bound to make a decision for him or herself.  This is not a democracy where the group vote wins.  This is about individual deliberations.  So I am going to ask each of you whether or not you believe there is a reasonable probability that the jury might be able to reach a verdict on counts 6 and 7."  The court then asked each juror individually whether he or she believed that there was "a reasonable probability" the jury could reach a verdict on counts 6 and 7.  Each one answered in the negative.

The court stated, "Okay.  All right.  Well, that's not the end of it.  There's more.  Okay.  Now I am going to ask you . . . how many times you voted.  I need to know how many times you voted on counts 6 and 7.  And I need to know when.  So when and how many times.  Okay.  And then I am also going to ask you for the numerical breakdown, but I don't need to know which way it's leading.  I just want a number.  So I want to know when, how many times, and what the numerical breakdown was.  You think you can give that to me right now, or do you need to reflect?  The foreperson said he needed some time to reflect.

The court continued:  "Okay.  Well, let's do this.  You all can go in the back for just a moment, talk about this, and get that organized for me.  I am going to, you know, go through each and every single one of the ballots you took on 6 and 7, not on everything because you may not have taken ballots at the same time on everything.  I just want to know about counts[s] 6 and 7.  So go into the back and talk about that, and then we'll buzz you back out."

After the jury returned from the deliberation room, the following exchange occurred:

"THE COURT:  So did you vote on count[s] 6 and 7 on April 29 on Monday?

"JUROR NO. 18:  Yes.

"THE COURT:  And when did you do that?  What time?

"JUROR NO. 18:  After lunch.

"THE COURT:  Okay.  Give me a ballpark.

"JUROR NO. 18:  About 1:30, after 1:30.

"THE COURT:  Just ate, came back, and voted?

"JUROR NO. 18:  No.  We had been deliberating and discussing.

"THE COURT:  You just kind of knew you were going to vote after lunch?

"JUROR No. 18:  Yes.

"THE COURT:  Okay.  So let's say 1:30 p.m. on April 29.  Did you vote on 6 and 7 at the same time?

"JUROR NO. 18:  Yes.

"THE COURT:  Okay, so first of all, on count 6, what was the numerical split?  Again, don't tell me which way it is leaning.  Just tell me what the numerical split was.

"JUROR NO. 18:  9, 3.

"THE COURT:  9 to 3.  And then count 7?

"JUROR NO. 18:  9 to 3.

"THE COURT:  Did you vote again on Monday on count[s] 6 and 7?

"JUROR NO. 18:  We voted twice on Monday.

"THE COURT:  Okay.  What time did you vote again?

"JUROR NO. 18:  Towards the end.

"THE COURT:  Near 4:00?

"JUROR NO. 18:  Yes.

"THE COURT:  I will just say 4:00 p.m.  And did you follow the same format of taking a vote on both counts 6 and 7 at the same time?

"JUROR NO. 18:  Yes.

"THE COURT:  What was the numerical split on count 6?

"JUROR NO. 18:  9, 3.

"THE COURT:  And what was the numerical split on count 7?

"JUROR NO. 18:  9, 3.

13

"THE COURT: Okay. Now the readback of testimony, you received that yesterday morning?

"JUROR NO. 18: Yes.

"THE COURT: Right?

"JUROR NO. 18: Yes.

"THE COURT: Okay. You also asked for something else, the diagram on the DNA on the gloves. We gave that to you yesterday afternoon.

"JUROR NO. 18: Yes.

"THE COURT: On April 29 then, this is Monday again, you voted twice. And that's it, correct?

"JUROR NO. 18: Yes.

"THE COURT: And then on April 30, did you vote again on counts 6 and 7?

"JUROR NO. 18: No.

"THE COURT: You did not vote at all?

"JUROR NO. 18: No.

"THE COURT: So no votes yesterday on count[s] 6 and 7 at all?

"JUROR NO. 18: No.

"THE COURT: Did you vote on count[s] 6 and 7 at all yesterday?

"JUROR NO. 18: No.

"THE COURT: Okay. So no votes on April 30. Today, May 1, Wednesday, you came back to it, I take it?

"JUROR NO. 18: Yes.

"THE COURT: And so you voted again today; is that right?

"JUROR NO. 18: No.

"THE COURT: You did not vote today?

"JUROR NO. 18: No.

"THE COURT: No vote at all?

"JUROR NO. 18: Oh, yes, yes. Sorry, sorry. Yes, we did.

"THE COURT: Did you formally take a vote on counts 6 and 7?

14

"JUROR NO. 18:  Yes.

"THE COURT:  At what time did you take a formal vote on count[s] 6 and 7?

"JUROR NO. 18:  It was early in the morning.

"THE COURT:  No, you didn't get here early in the morning.

"JUROR NO. 18:  10:00. Sorry.

"THE COURT:  So first thing in the morning when you came and on count 6 what was the numerical breakdown?

"JUROR NO. 18:  Still 9, 3.

"THE COURT:  And then how about on count 7?

"JUROR NO. 18:  9, 3.

"THE COURT: 9, 3.  Okay.  Now did you—you sent out a note around 11:00.  We weren't able to get to you right away because I was in trial, and I had to assemble everybody.  So that meant that you took a vote early in the morning, and then you might have spent time discussing it afterwards a little bit?

"JUROR NO. 18:  Yes.

"THE COURT:  But that maybe you spent another hour, hour and a half discussing it this morning after taking the vote?

"JUROR NO. 18:  Yes.

"THE COURT:  Did you take another vote?

"JUROR NO. 18:  No.

"THE COURT:  No.  No votes since the early vote.  So you have actually voted on it three times; is that correct?

"JUROR NO. 18:  Yes.

"THE COURT:  The bulk of the rest of the time you spent talking about the other counts? Because you all started on Monday, Monday morning.  You had seven counts to deal with, three separate transactional events.  So you talked about the other counts for the bulk of the time.  Would that be accurate to say?

"JUROR NO. 18:  Yes.

"THE COURT:  How much time have you actually spent talking about these two counts?

15

"JUROR NO. 18: When we got our first juror on Monday, we spent—

"THE COURT: Okay. So let's say you started on Monday, oh, two hours in the morning and then two and a half hours in the afternoon. So you had about four and a half hours yesterday. I'm sorry. The day before. And then let's say about the same period of time yesterday. So four and a half yesterday or thereabouts. And then today, you have had an additional two or so. So you have been talking about this maybe, oh, 11 hours. Of the 11 hours or so, how much of it have you devoted to talking about count[s] 6 and 7? Three hours?

"JUROR NO. 18: About three hours, yes, around.

"THE COURT: Is that a fair, rough estimate? About three hours?

"JUROR NO. 18: Yes.

"THE COURT: Okay. You know, it's my reason to judgment [*sic*] that you need to spend a little more time on this. There are a lot of counts and a lot of things for you to discuss. There are over 20 witnesses that were presented and scientific evidence as well. And you are talking about three separate transactional events that you had to talk about. And I am not saying that three hours or so is not, is insubstantial. That is a bit of time. But I think some more time needs to be spent talking about it. So I am not going to declare that you are hopelessly deadlocked at this point. And I am going to send you back to talk some more about count[s] 6 and 7. Okay?

"JUROR NO. 18: Okay.

"THE COURT: Okay. If you have a question, write it out for me. Okay. All right. Thank you."

After the jury left, the court informed counsel, "I am not going to take the verdict. I am going to let them talk some more. If they can't, the next time they tell me, that is probably going to be it. But they need to work a little more." Defense counsel did not object.

16

Approximately an hour later, the jury sent out a note requesting that counsel reargue counts 6 and 7, and that Steve Renteria's testimony be read back.[5] They also requested a latex glove and testimony from N. M. The court again confirmed with Juror No. 18 that the jury had reached verdicts on counts 1 through 5 and asked the jury to deposit the completed verdict forms with the court in a sealed envelope. The jury asked to hear reargument before any readback. The court stated it could not guarantee reargument, but that it would consult with counsel and then exercise its discretion.

On the following day, May 2, 2013, the court stated for the record that both sides were agreeable to making further argument. After hearing additional argument from both sides, the jury retired to continue deliberation and listen to readback. Apart from a lunch break, the jury continued with readback and deliberations until the end of the day.

On May 3, 2013, a Friday, the jury deliberated all day. They requested and received the verdict forms from the court. The jury met again the following Monday, May 6, 2013, and spent a further two hours in deliberation before reaching its verdicts.

### C. Relevant Authority

Section 1140 provides that "the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict . . . unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." In the event of a deadlock, "[t]he court may ask jurors to continue deliberating where, in the exercise of its discretion, it finds a 'reasonable probability' of agreement." (*People v. Pride* (1992) 3 Cal.4th 195, 265; see *People v. Howard* (2008) 42 Cal.4th 1000, 1029-1030.) Even where the jury has deliberated for a substantial amount of time and indicates that it is unable to reach a verdict, the trial court still retains discretion to require further deliberation. (*People v.*

---

[5] Steve Renteria, a forensic scientist with the Los Angeles County Sheriff's Department, testified regarding the results of testing Wyesser Cook's sexual assault kit and certain items of evidence. He stated that the DNA profile of the male contributor to Cook's external genital sample and some of the evidence from the crime scene matched the DNA profile from defendant. As noted, the jury acquitted defendant of all charges regarding the offenses against Cook.

*Sandoval* (1992) 4 Cal.4th 155, 194-197; *People v. Breaux* (1991) 1 Cal.4th 281, 319-320 [jury informed court it had reached an impasse after four days of deliberation, answered in the negative as to whether there was a chance of verdict upon further deliberation, and was properly asked twice to deliberate further]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 775-776 [after 11 days of deliberation and five expressions of impasse, trial court asked jury to resume deliberation].)

"'Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived "'as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered.'"'" (*People v. Bell* (2007) 40 Cal.4th 582, 616.) A defendant's right to due process is violated if a trial court coerces jurors into reaching a verdict. (*Jiminez v. Myers* (9th Cir. 1993) 40 F.3d 976, 978-980.)

### D. Verdict Not Coerced

Defendant appears to argue that simply because the jury stated that it was deadlocked, the trial court was obligated to cease deliberations. We disagree. "'[Section 1140] clearly commits to the trial judge, not to the jury, the determination of the question whether or not "there is no reasonable probability that the jury can agree."'" (*People v. Finch* (1963) 213 Cal.App.2d 752, 763.) The trial court is required to determine in its "sound discretion" whether there is a reasonable probability of agreement by the jury. (*People v. Miller* (1990) 50 Cal.3d 954, 994.)

Defendant asserts that the trial court "subtly coerced the jury to reach a verdict." In analyzing a claim of coercion, the relevant inquiry is whether the trial court's comments imposed such pressure on jurors to reach a verdict that the accuracy and integrity of the jury's stated conclusion cannot be assured. (*People v. Gainer* (1977) 19 Cal.3d 835, 850 (*Gainer*), disapproved on another point in *People v. Valdez* (2012) 55 Cal.4th 82, 163.) "The question of coercion is necessarily dependent on the facts and circumstances of each case. [Citation.]" (*People v. Sandoval*, *supra*, 4 Cal.4th 155, 196;

*People v. Pride*, *supra*, 3 Cal.4th at p. 265; *People v. Breaux*, *supra*, 1 Cal.4th 281, 319.)

We find nothing coercive in the trial court's actions here. It did not urge the jury to reach an agreement, only to deliberate a bit longer. Far from being coercive, the trial court's inquiries as to whether it could do anything to aid the jurors in their deliberations was a commendable exercise of discretion under Evidence Code section 1140. The trial court realized through its questioning of the foreperson that the jury had seemingly given up and had ceased deliberating on counts 6 and 7. When the jury was asked if the court could do anything, the jury members were apparently looking at each other, which would indicate to the court that there was some uncertainty among them. The trial court would have been remiss if it had not sought to ascertain whether the jury would benefit from any of the means available to the court.

We perceive nothing in the trial court's comments that could be construed as pressuring the minority jurors to give more credence to the majority than to their own opinions. The court emphatically pointed out that it was not a democracy where the majority rules. The court had instructed the jurors with CALJIC No. 17.40, which provided, "The People and the defendant are entitled to the individual opinion of each juror. Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of the jurors, or any of them, favor that decision." The jury indicated specifically that further argument and a readback of testimony would assist it in reaching a verdict. The trial court obliged without imposing its own opinion or pressuring jurors to reach a verdict. We note that it is not improper to require continued deliberation even when there is only one holdout juror. (*People v. Pride*, *supra*, 3 Cal.4th 195, 265 [requiring jury divided 11 to 1 to continue deliberating is not necessarily coercive]; *People v. Neufer* (1994) 30 Cal.App.4th 244, 253-254 [not coercive to require jury to resume deliberations when verdict is 11 to 1 in favor of guilt].) Here, there were three minority jurors, leading to a reasonable conclusion they would not be easily

19

intimidated by further discussion and direction from the trial court. As long as the court's inquiry and instruction are neutral and the holdout jurors are not singled out, the court properly exercises its discretion in requiring further deliberations.

Contrary to defendant's assertion, the problems identified in *Gainer* are lacking here. *Gainer* rejected the so-called "'*Allen* charge,'" which was approved by the United States Supreme Court in *Allen*, *supra*, 164 U.S. 492, 501-502, as a means of "'blasting' a verdict out of a deadlocked jury." (*Gainer*, *supra*, 19 Cal.3d at p. 844.) *Gainer* held, "it is error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried." (*Id*. at p. 852.)

Unlike the *Allen* charge, the trial court's comments here did not suggest that the minority jurors should consider the position of the majority, thereby avoiding any undue pressure on the minority jurors to consider that factor. The trial court stressed to the jury members that each juror was duty-bound to make his or her own decision and that the majority vote does not win. The court's comments about the length of the trial was not a de facto *Allen* charge, but merely an observation made to encourage the jurors to try again, since they had devoted a substantial amount of time to the task. The trial court did not advise the jury that it was required to reach a verdict, did not indicate that a retrial would be required if a verdict was not reached, and did not suggest that the minority jurors should reconsider their positions in light of the majority.

Finally, it is proper to permit counsel to reargue a case after the matter has been submitted and deliberations have commenced. As noted in *People v. Young* (2007) 156 Cal.App.4th 1165 (*Young*), California Rules of Court, rule 2.1036, provides: "If the trial judge determines that further action might assist the jury in reaching a verdict, the judge may: (1) Give additional instructions; [¶] (2) Clarify previous instructions; [¶] (3) Permit attorneys to make additional closing arguments; or [¶] (4) Employ any combination of these measures." (Cal. Rules of Court, rule 2.1036(b); see *Young*, at p. 1171, fn. 7.)

20

Thus, the trial court was well within its discretion in polling the jury to determine the extent of the impasse and in asking the jury to see if it could agree on some assistance from the trial court. The court mentioned the option of argument in passing as one of the tools that could be used and by no means urged it upon the jury. Defense counsel did not object to this suggestion. Moreover, although a quick verdict following a trial court's intervention *may* suggest "the possibility of coercion," (*Lowenfield v. Phelps* (1988) 484 U.S. 231, 240), we have no such circumstance here. The jury deliberated for a substantial amount of time after hearing reargument. Significantly, the trial court acknowledged to the attorneys the last time he sent the jury back before their argument request that if the jury came back announcing deadlock again, "that is probably going to be it." The trial court showed no intention of pressuring the jurors to reach a verdict but only of doing all it reasonably could do to assist the jurors rather than to "'figuratively throw up its hands and tell the jury it cannot help.'" (*Young*, *supra*, 156 Cal.App.4th at p. 1171.)

We conclude the trial court's actions in managing the jury's impasse are reasonably perceived as a means of providing the jurors with the means to enhance their understanding of the case and not as a way of pressuring the jury members to arrive at a verdict based on considerations they had already discussed. (See *People v. Bell* (2007) 40 Cal.4th 582, 616.) The court did not abuse its discretion or err in ordering further deliberations.

## II. Jury Instruction on Consent

### A. Defendant's Argument

Defendant argues that CALJIC No. 1.23.1 is defective in two ways. First, it relieves the prosecution of its burden of showing that intercourse was against the will of the alleged victim by establishing a presumption that the victim did not consent if there is no "positive cooperation."[6] The instruction ignores the possibility that an alleged victim

---

[6] The trial court read CALJIC No. 1.23.1, which tracks the language of section 261.6, as follows: "In prosecutions for the sexual offenses in this case, the word 'consent' means positive cooperation in an act or attitude as an exercise of free will. The

21

may passively assent. Secondly, it operates as a mandatory presumption. Defendant adds that the instruction deprived him of his due process right to a trial by jury, since it is akin to the failure to instruct on an essential element of an offense, and his convictions therefore should be reversed.

### B. Relevant Authority

Section 261.6 provides: "In prosecutions under Section 261, 262, 286, 288a, or 289, in which consent is at issue, 'consent' shall be defined to mean positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved. [¶] A current or previous dating or marital relationship shall not be sufficient to constitute consent where consent is at issue in a prosecution under Section 261, 262, 286, 288a, or 289. [¶] Nothing in this section shall affect the admissibility of evidence or the burden of proof on the issue of consent."

"A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel." (*People v. Lee* (2011) 51 Cal.4th 620, 638 (*Lee*).) "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" (*People v. Wade* (1995) 39 Cal.App.4th 1487, 1491.)

### C. Consent Adequately Defined

At the outset, we note that *Lee* held that the defendant in that case forfeited his claim that the instructions defining consent for attempted rape were inadequate by failing to object. (*Lee*, *supra*, 51 Cal.4th at p. 638.) The court stated that a defendant's failure to request clarification of an otherwise correct instruction forfeits any claim of error on appeal. (*Ibid.*) Since defendant makes a claim of ineffective assistance of counsel for any forfeiture, however, we address the merits of his argument.

---

person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved."

We conclude the jury was adequately instructed on the issue of consent. The jury was told at the outset that it must consider the instructions as a whole and each instruction in light of all the others. (CALJIC No. 1.01.) The jury was instructed in the crime of rape with CALJIC No. 10.00, which stated that rape is committed by every person who engages in an act of sexual intercourse accomplished against that person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury to that person. The instruction for unlawful oral copulation, CALJIC No. 10.10, contains the same language. In these instructions, the jury was told that "against the will" meant "without consent of the alleged victim."

The jury in defendant's case was also given CALJIC No. 10.65, which instructed the jury that "In the crime of unlawful forcible rape, oral copulation by force and, forcible sexual penetration, criminal intent must exist at the time of the commission of the specified crime. [¶] There is not criminal intent if the defendant had a reasonable and good faith belief that the other person voluntarily consented to engage in sexual intercourse, oral copulation, or sexual penetration. Therefore, a reasonable and good faith belief that there was voluntary consent is a defense to such a charge, unless the defendant thereafter became aware or reasonably should have been aware that the other person no longer consented to the sexual activity. [¶] However, a belief that is based upon ambiguous conduct by an alleged victim that is the product of conduct by the defendant that amounts to force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of the alleged victim or another is not a reasonable good faith belief. [¶] If after consideration of all of the evidence you have a reasonable doubt that the defendant had criminal intent at the time of the accused sexual activity, you must find him not guilty of the crime." Finally, the jury was told that the presumption of reasonable doubt places on the prosecution the burden of proving the defendant guilty beyond a reasonable doubt. (CALJIC No. 2.90.)

Given these comprehensive instructions, defendant cannot assert that he was denied the "longstanding and meritorious defense" of passive assent. Juries are presumed to follow instructions, and had the jury believed the victims passively consented to have

23

sex with defendant, and that it was not against their will, under these instructions, the jury would have acquitted defendant. (See *People v. Morales* (2001) 25 Cal.4th 34, 47-48.) As in *Lee*, where the defendant also argued that an instruction on passive consent was lacking, "[t]hese instructions were sufficient to apprise the jury of the relevant principles of law on the issues of intent and consent." (*Lee*, *supra*, 51 Cal.4th at pp. 637, 640.) The instructions allowed the jury to consider defendant's arguments that although he had sex with the alleged victims, they were not forced, and both victims were suffering from something akin to buyer's remorse. To the extent defendant attempted to portray that he had a good faith belief that they consented, this defense was specifically addressed in CALJIC No. 10.65. Accordingly, defendant's passive consent defense was not vitiated by CALJIC No. 1.23.1 because that instruction, as well as the other instructions, adequately informed the jury that the offenses had to be against the alleged victim's will to be unlawful and had to have been accomplished "by force, violence, duress, menace, or fear of immediate and unlawful bodily injury."

Under *Lee* and in this court's prior opinion in *People v. Gonzalez* (1995) 33 Cal.App.4th 1440 (*Gonzalez*), we also conclude there was no creation of a mandatory presumption that consent should be presumed absent evidence of positive cooperation in an act or attitude, thus relieving the prosecution of its burden of proving an essential element of the offense. (*Lee*, *supra*, 51 Cal.4th at p. 641; *Gonzalez*, at p. 1443.) That contention was rejected by this court in *Gonzalez*, and the reasoning of that case applies here. *Gonzalez* stated, "CALJIC No. 1.23.1 did not shift the burden of proof on consent to the defense or create a presumption of lack of consent. The instruction merely defined consent." (*Gonzalez*, at p. 1443.) *Gonzalez* concluded that, when read in light of other relevant instructions defining the crime, the instructions "clearly indicated the prosecution had the burden of proving lack of consent." (*Id*. at p. 1443.) Moreover, the fact that the instructions also stated that the act must be accomplished by "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the alleged victim" indicated that no confusion would be created in the minds of the jurors. (*Id*. at p. 1444.) *Lee*, citing *Gonzalez*, also held that that the mandatory presumption claim lacks merit,

24

since the instruction does not "tell a jury that it must presume lack of consent if the alleged victim has not actively expressed consent." (*Lee*, *supra*, at p. 641.) In fact, the jury was told that the defendant was presumed innocent until the prosecution proved him guilty beyond a reasonable doubt. (*Ibid*.) In the instant case, as in *Lee* and *Gonzalez*, all of the instructions considered together "clearly indicated the prosecution had the burden of proving lack of consent." (*Gonzalez*, at p. 1443; see also *Lee*, at p. 642.)

## III. Lack of Instruction on Withdrawal of Consent

### A. Defendant's Argument

Defendant contends the trial court erred in failing to give sua sponte an instruction on withdrawal of consent because, in order for the jury to determine whether defendant had committed a sexual offense against his ex-girlfriend, the jurors had to decide if she withdrew consent prior to defendant's continued penetration. Defendant maintains the error was prejudicial in that it is reasonably probable there would have been a more favorable outcome in the absence of the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

### B. Proceedings Below

The prosecutor filed a motion under Evidence Code section 1108 to introduce the testimony of defendant's ex-girlfriend, Keisha H. The court found under Evidence Code section 352 that the incident with Keisha was probative and not substantially outweighed by prejudice.

With respect to the evidence of prior sex crimes, the trial court instructed the jury with CALJIC Nos. 2.50.01, and 2.50.1.[7]

---

[7] CALJIC No. 2.50.01 stated: "Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense on one or more occasions other than that charged in the case. [¶] 'Sexual offense' means a crime under the laws of a state . . . that involves any of the following: [¶] Any conduct made criminal by Penal Code section 261, subdivision (a)(2). The elements of this crime are set forth elsewhere in these instructions. [¶] If you find, by a preponderance of the evidence, that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit sexual offenses. This evidence, if believed, does

## C. Relevant Authority

The trial court has a sua sponte duty to instruct the jury "on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) On the other hand, absent a request by the defense, the court has no duty to give a "'pinpoint instruction' relating specific facts to the elements of the offense" in support of a defense. (*People v. Barton* (1995) 12 Cal.4th 186, 197.)

Although the initial focus is on the specific instruction challenged, a reviewing court must review the instructions as a whole to determine if the entire charge to the jury delivered a correct interpretation of the law. (*People v. Fonseca* (2003) 105 Cal.App.4th 543, 549.).

## D. No Sua Sponte Duty to Instruct on Withdrawal of Consent

---

not establish a disposition to commit any other crime. If you find that the defendant had a disposition to commit a sexual offense, you may, but are not required to, infer that he was likely to commit and did commit the . . . crimes of which he is accused. The uncharged evidence pertaining to Yolanda [] and Keisha [] may be considered by you only for the purpose of deciding whether the defendant is guilty of the crimes charged in counts 5, 6 and 7. . . . [¶] However, if you find by a preponderance of the evidence that the defendant committed [a] prior sexual offense, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime.

CALJIC No. 2.50.1 stated: "Within the meaning of the preceding instructions, the prosecution has a burden of proving by a preponderance of the evidence that a defendant committed sexual offenses other than those for which he is on trial. [¶] You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that the defendant committed the other uncharged sexual offenses. [¶] If you find other uncharged sexual offenses were committed by a preponderance of the evidence, you are nevertheless cautioned and reminded that before a defendant can be found guilty of the crimes charged for which this evidence may be considered in this trial, the evidence as a whole must persuade you beyond a reasonable doubt that the defendant is guilty of that crime.

26

Defendant points out that CALJIC No. 1.23.1 contains optional language[8] related to withdrawal of consent. Because the jurors had to decide whether Keisha effectively withdrew consent before defendant's continued penetration, failure to read this optional language to the jurors was prejudicial error. Defendant cites *People v. Ellis* (1999) 69 Cal.App.4th 1334 for the proposition that the trial court has a sua sponte duty to give clarifying instructions where the terms used in an instruction have a technical meaning peculiar to the law. (*Ellis*, at pp. 1338-1339 [trial court had sua sponte duty to define "speeding" when the conviction was based on a violation of the "basic speed law" statute, which contained several legal terms, such as "reasonableness"].)

We do not believe withdrawal of consent involves legal terminology peculiar to the law. The jury was instructed in the meaning of consent with CALJIC No. 1.23.1, and to "withdraw" something (such as consent) has a common sense meaning that is "'commonly understood by those familiar with the English language.'" (*People v. Ellis*, *supra*, 69 Cal.App.4th at p. 1338.) The instruction on consent was sufficient for the jurors to determine from Keisha's testimony whether she withdrew her consent during the incident to which she testified.

Furthermore, the offense against Keisha constituted *uncharged* conduct. *People v. Cottone* (2013) 57 Cal.4th 269 recently stated, "We have long recognized that 'the trial court ordinarily has no sua sponte duty to instruct the jury as to the admissibility or use of other crimes evidence.' [Citations.] This principle is consistent with [Evidence Code] section 355, which provides that the trial court, 'upon request,' shall instruct the jury

---

[8]     The optional language is as follows: "A person who initially consents and participates in the act of _____ has the right to withdraw that consent. To be effective as a withdrawal of consent, the person must inform the other person by words or conduct that consent no longer exists, and the other person must stop. The words or conduct must be sufficient to cause a reasonable person to be aware that consent has been withdrawn. If the other person knows or reasonably should know that consent has been withdrawn, forcibly continuing the act of _____ despite the objection, is against the will and without the consent of the person."

about evidence admitted for a limited purpose." (*Cottone*, at p. 293.) The same reasoning applies in defendant's case.

The *Cottone* court noted that a defendant, for tactical reasons, may not want the jury "overloaded" with instructions on the elements of alleged other crimes out of fear that such instructions could place undue emphasis on those crimes. (*People v. Cottone*, *supra*, 57 Cal.4th at p. 294.) This consideration would appear to be appropriate in the instant case, where there were several charged sexual offenses with detailed instructions, and the language defendant claims was lacking had relevance only to one uncharged, and briefly mentioned, act.

Finally, any error in not including the language on withdrawal of consent was harmless under any standard. As noted, other instructions adequately covered the concept of what constituted consent. The fact that Keisha asked defendant to stop, if believed by the jury, left no ambiguity that required clarification by means of the omitted optional language. Furthermore, defendant's conduct with Keisha was not inflammatory, as defendant asserts. The conduct involved sex that was initially consensual between defendant and his girlfriend—not a stranger to whom he had offered a ride. Nor did Keisha say that defendant used violence or the threat of violence. Therefore, the jury's consideration of what happened with Keisha would not have adversely affected the verdicts on the charged sexual offenses.

## IV. Evidence Admitted Pursuant to Evidence Code Section 1108

### A. Defendant's Argument

Defendant contends the evidence of the alleged prior offenses was inadmissible under Evidence Code section 1108. Its probative value on the question of propensity to engage in the charged offenses was substantially outweighed by the undue confusion and prejudice resulting from testimony regarding the prior incidents, particularly Keisha's testimony about defendant's refusal to promptly cease intercourse when requested to do so. According to defendant, the prejudicial evidence rendered his trial fundamentally unfair in violation of his due process rights, and reversal is required.

### B. Relevant Authority

Evidence Code section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Subdivision (d)(1)(A) of Evidence Code section 1108 provides that, for purposes of this section, a sexual offense includes "[a]ny conduct proscribed by Section . . . 261, . . . 288a, . . .289, . . . of the Penal Code."

With the exception of Evidence Code section 1101, Evidence Code section 1108 "does not supersede other provisions of the Evidence Code, such as normal hearsay restrictions and the court's authority to exclude evidence presenting an overriding likelihood of prejudice under [Evidence Code] section 352. [Citation.]" (*People v. Soto* (1998) 64 Cal.App.4th 966, 984.) Under Evidence Code section 1108, evidence of prior sexual offenses to show disposition is """"no longer treated as intrinsically prejudicial or impermissible."""" (*Soto*, at p. 984.) As with other forms of relevant evidence not subject to an exclusionary rule, the presumption is in favor of admitting the evidence. (*Ibid*.)

The "determination as to whether the probative value of such evidence is substantially outweighed by the possibility of . . . unfair prejudice or misleading the jury is 'entrusted to the sound discretion of the trial judge who is the best position to evaluate the evidence.' [Citation.]" (*People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1097.) "'A trial court's exercise of its discretion under section 352 '"must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'""" (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 966.)

### C. Evidence Properly Admitted Under Evidence Code Section 1108

In the instant case, the charged and uncharged offenses are all sex offenses, and the uncharged offenses were therefore presumed admissible. (*People v. Frazier* (2001) 89 Cal.App.4th 30, 41 ["It is enough the charged and uncharged offenses are sex offenses as defined in section 1108."].) In arguing to the contrary, defendant reviews several

29

cases in which the trial court's admission of evidence under Evidence Code section 1108 was held to be a proper use of discretion and contrasts these cases with *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*). In that case, the reviewing court found reversible error in the trial court's admission of evidence of a prior sex offense under Evidence Code section 1108. According to defendant, as in *Harris*, the probative value of the evidence in his case was outweighed by the prejudicial impact and risk of jury confusion.

Harris was a mental health nurse who was charged with sexually molesting two female patients. (*Harris*, *supra*, 60 Cal.App.4th at p. 730-732.) His defense to the charges relating to one of the victims was that the victim was hallucinating. With respect to the second victim, his defense was a combination of consent, reasonable belief in consent, and the victim's attempt to excuse her previous adultery with Harris. (*Id*. at p. 732.) The prosecution introduced other-crimes evidence of a 23-year-old offense in which Harris had raped, beaten, and mutilated the victim, who was not a patient of his. (*Id*. at pp. 733-735) The jury convicted Harris of several offenses against the two female patients. (*Id*. at pp. 731-732.) Harris contended on appeal that the admission of the prior offense was unduly prejudicial, and the Court of Appeal agreed. (*Id*. at pp. 730, 741.)

The *Harris* court believed the defendant's defense to each count was strong. (*Harris*, *supra*, 60 Cal.App.4th at p. 733.) The court then reviewed the redacted description of the prior offense that was given to the jury and concluded that it may have caused the jury to speculate about the true nature of the crime. (*Id*. at pp. 733-735.) The court stated, "This altered version of a 23-year-old act of inexplicable sexual violence while heavy with 'undue prejudice' and dangerous in the hands of a jury was not particularly probative of the defendant's predisposition to commit these 'breach of trust' sex crimes." (*Id*. at pp. 740-741.)

*Harris* is not instructive in the instant case. There was no altered or redacted version of defendant's prior offenses presented to the jury such that it would cause the jury members to speculate about what defendant had really done. Moreover, as discussed *infra*, neither of the two uncharged offense descriptions were "heavy with 'undue prejudice'" so as to be dangerous to defendant's case. (*Harris*, *supra*, 60 Cal.App.4th at

30

pp. 740, 741.)  Defendant's case is clearly unlike *Harris*, where the defendant had strong defenses to the crimes charged and the prior offense was far more serious and egregious.

*People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*) established criteria for courts to consider when ruling on the admissibility of evidence of prior sexual offenses.  (*Id.* at pp. 916-917.)  The factors to be considered in conducting the analysis depend on the unique facts and issues of each case.  (*Ibid.*; *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1116.)  Factors that are particularly significant in an Evidence Code section 1108 case are:  "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time. [Citation.]  A trial court balances this first factor, i.e., the propensity evidence's probative value, against the evidence's prejudicial and time-consuming effects, as measured by the second through fifth factors."  (*Nguyen*, at p. 1117.)

The evidence given by Keisha was probative in that it had a tendency to show defendant's predilection for forcing sex on a woman who says "no."  Evidence Code section 1108 has no requirement that the offenses be so similar that evidence of the prior acts would be admissible under Evidence Code section 1101.  If such strict similarities were required, "Evidence Code section 1108 would serve no purpose."  (*People v. Frazier*, *supra*, 89 Cal.App.4th at pp. 40-41.)  The evidence given by Yolanda was even more probative because it was more similar, given that she was a stranger picked up by defendant on the street.  The evidence of prior misconduct in this case was not likely to confuse the jury, nor was the jury likely to have sought to punish defendant for his conduct with Yolanda.  Yolanda informed the jury she had been to court in the matter, and the jury therefore knew the crime had been reported and adjudicated in some fashion.

31

In any event, as discussed *infra*, defendant had an opportunity to inform the jury that he was convicted only of sexual battery on Yolanda.  The prior victims' testimony did not consume an overly large portion of the total trial testimony.  Keisha's testimony in particular was very brief.  In addition, the prior acts were not more inflammatory than the charged conduct.  The prior conduct with Keisha might be viewed by some as significantly less disturbing, since it involved someone with whom defendant had a relationship.  The prior acts were not remote, since all of the offenses—charged and uncharged—occurred within a time span of approximately eight years.

Moreover, in this case, the court heard exhaustive argument from both parties and engaged in a lengthy discussion on admission of the uncharged offenses.  The court took a great deal of time to weigh the evidence and explain its rulings.  As in *People v. Taylor* (2001) 26 Cal.4th1155, 1169, the record as a whole shows the court undertook a careful weighing process in reaching its decision.  The type of evidence elicited in this case was properly admitted under Evidence Code section 1108 and *Falsetta*, *supra*, 21 Cal.4th 903. (See *People v. Loy* (2011) 52 Cal.4th 46, 60-64.)

Finally, we note that "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is "prejudicial."  The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying section 352, "prejudicial" is not synonymous with "damaging."'  [Citation.]"  (*People v. Karis* (1988) 46 Cal.3d 612, 638.)  We conclude that defendant's prior offenses were highly probative, and the probativeness substantially outweighed any potential prejudice.  Because we perceive no error, we do not address defendant's argument that the trial court's error was not harmless.

## V. Evidence Code Section 1108 and Constitutional Violations

### A. *Defendant's Argument*

Defendant cites *Garceau v. Woodford* (9th Cir. 2001) 275 F.3d 769 (*Garceau*) for the proposition that using other crimes evidence to infer criminal propensity violates the due process clause. He urges that *Falsetta*, *supra*, 21 Cal.4th 903, should be reconsidered in light of *Garceau*. Defendant also asserts that Evidence Code section 1108 violates equal protection.

### B. Falsetta *Holdings Unaffected by* Garceau

Defendant's additional contention that Evidence Code section 1108 deprived him of equal protection and the right to a fair trial is equally unavailing. In *Falsetta*, our Supreme Court cited with approval the Court of Appeal's rejection of due process and equal protection challenges in *People v. Fitch* (1997) 55 Cal.App.4th 172, 184-185 (*Fitch*). (*Falsetta*, *supra*, 21 Cal.4th at p. 918.) *Falsetta* concluded that "in light of the substantial protections afforded to defendants in all cases to which section 1108 applies, we see no undue unfairness in its limited exception to the historical rule against propensity evidence" and that "the trial court's discretion to exclude propensity evidence under section 352 saves section 1108 from defendant's due process challenge." (*Id.* at pp. 915, 917.)

With respect to equal protection, *Falsetta* noted that the Legislature reasonably could create an exception to the propensity rule in sex offense cases "because of their serious nature, and because they are usually committed secretly and result in trials that are largely credibility contests." (*Falsetta*, *supra*, 21 Cal.4th at p. 918.) Quoting *Fitch*, *supra*, 55 Cal.App.4th at pages 184-185, the Supreme Court explained that "'[t]he Legislature is free to address a problem one step at a time or even to apply the remedy to one area and neglect others. [Citation.]' [Citations.]" (*Falsetta*, at p. 918; see also *People v. Waples* (2000) 79 Cal.App.4th 1389, 1394-1395; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1310-1311.) We agree with these authorities.

Defendant contends, however, that the holding in *Falsetta* must be reconsidered in light of *Garceau*, which held that the trial court erred in reading a jury instruction that did

not limit the jury to a permissible inference based on other crimes evidence, but rather invited the jury to draw the additional inference of criminal propensity. (*Garceau*, *supra*, 275 F.3d at p. 775.) Defendant asserts that under the reasoning of *Garceau*, other-crimes evidence admitted to infer criminal propensity violates the due process clause.

*Garceau* is, of course, not binding on this court. (*People v. Avena* (1996) 13 Cal.4th 394, 431) In any event, it is not relevant to the instant case. *Garceau* did not discuss the admissibility of prior sex offenses in a sex offense case, but rather, the introduction of evidence that the defendant had been convicted of murder in a prior case and testimonial evidence that he manufactured illegal drugs, introduced under Evidence Code section 1101. (*Garceau*, *supra*, 275 F.3d at p. 773.) The California Supreme Court held that the admission of prior crimes evidence to show Garceau's propensity to commit murder violated California law, but the error was harmless. (*Id*. at p. 774.) The Ninth Circuit disagreed only with the finding that the error was harmless. (*Id*. at p. 775.)

Furthermore, in *U.S. v. LeMay* (9th Cir. 2001) 260 F.3d 1018, 1031, the Ninth Circuit held that Federal Rules of Evidence, rule 414 (28 U.S.C.), which concerns admission of evidence of another offense of child molestation, is constitutional. The court held that rule 414 does not violate due process, equal protection, or any other constitutional guarantee in light of Federal Rules of Evidence, rule 403, which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. (*U.S. v. LeMay*, at p. 1031.) The reasoning in *LeMay* thus parallels that of *Falsetta*, and it contradicts defendant's interpretation of *Garceau*.

Finally, it is clearly not our role to reevaluate *Falsetta*, which upheld the constitutionality of Evidence Code section 1108. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Defendant's arguments are without merit.

## VI. Common Plan or Scheme Evidence

### A. Defendant's Argument

Defendant argues that the common features between the Yolanda C. incident and the charged crimes were insufficient to establish a common plan or scheme, and admission of this evidence was inappropriate under Evidence Code section 1101,

34

subdivision (b).  The admission of this evidence was a prejudicial abuse of discretion and a violation of his federal right to due process under the Fifth and Fourteenth Amendments to the United States Constitution.

### B.  Proceedings Below

The prosecutor moved to present the evidence of Yolanda C. under Evidence Code section 1101, subdivision (b) because it showed "that the defendant has a common pattern in the way that he commits his forcible rape crimes."[9]  He would offer rides to women within a short distance from his residence.  The women accepted, and they would end up being forcibly raped.  The evidence would be offered specifically in relation to the charged crime against N.  The defense argued that the incidents bore no "signature," and defendant's act of meeting women by offering them rides was not sufficiently unique.  The court ruled that the evidence was not confusing, and the degree of similarity was sufficient under Evidence Code section 352.  The court found there was no undue prejudice in that the evidence would not prompt an emotional bias against the defendant.

### C.  Relevant Authority

"'The presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done.' [Citation.]  . . . The existence of such a design or plan also may be proved circumstantially by evidence that the defendant has performed acts having 'such a concurrence of common features that the various acts

---

[9]     Evidence Code section 1101, subdivision (a) provides:  "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

Subdivision (b) of Evidence Code section 1101, provides:  "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citation.] Evidence of a common design or plan, therefore, is not used to prove the defendant's intent or identity but rather to prove that the defendant engaged in the conduct alleged to constitute the charged offense." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393-394.)

"To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . . [E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he . . . used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense. [Citation.]" (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 403.)

### D. Evidence Properly Admitted Under Evidence Code Section 1101, Subdivision (b)

Defendant argues that, although the Yolanda C. incident bore some superficial similarity with the K. rape count, there was little similarity to the N. counts. The alleged rape and forcible oral copulation occurred in N.'s home. She had invited him over, and they smoked marijuana together and watched television. Also, the perpetrator used a gun on Yolanda and ordered her to undress, whereas K. did not mention a gun, and she testified that her assailant ripped off her clothes.

Despite the differences in the circumstances, we conclude there were sufficient similarities in the incidents to justify admission of the Yolanda C. incident as common plan evidence. In the Yolanda C. incident, as well as in the charged crimes, defendant was driving or sitting in his car when he saw the women and offered them a ride. He then interacted with them in a friendly manner until he ultimately asked them for sex. In N.'s case, it was logical that defendant would not attempt to have sex with her while her

36

children were in the car. Instead, he waited until he was in her home and her children were put to bed. In two of the instances defendant offered to pay for sex when the woman initially refused. In the uncharged incident, defendant used a gun to accomplish the rape. In the case of N., defendant used the threat of a gun. In all of the instances, defendant attempted to have sex with the women consensually, but when they refused, he used force and fear to make them comply with his demands. Thus, the instance of uncharged conduct was highly probative of defendant's scheme of trolling the streets of his neighborhood to pick up women for sex.

Moreover, the evidence was not more prejudicial than probative. The uncharged incident was not more inflammatory than either of the charged crimes. K. testified that defendant attempted to choke her, and N. stated that defendant threatened her with a gun with her two toddlers in the house. In the uncharged incident, Yolanda actually asked for a ride, thereby putting herself at risk, whereas in the charged incidents, defendant offered the ride, and the women accepted.

In any event, the admission of the uncharged incident was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *Watson*, *supra*, 46 Cal.2d at p. 836.) The trial court properly admitted the evidence of both uncharged incidents under Evidence Code section 1108. Therefore, the jury would have learned about the incidents even if the prosecutor had not sought admission of the Yolanda C. incident as showing a common plan or scheme.

Defendant's argument is without merit, and he suffered no violation of his federal right to due process.

## VII. Exclusion of Defendant's Prior Sexual Battery Plea

### A. *Defendant's Argument*

Defendant contends the trial court erred in refusing to take judicial notice of his plea to sexual battery and subsequent probation in the incident with Yolanda C. The court erroneously ruled that the plea was not relevant to whether defendant had raped Yolanda C.

### B. Proceedings Below

During the discussion of the admission of Yolanda C.'s evidence as a common scheme, defense counsel suggested to the court that it "would be a lot more fair if, rather than the conduct being introduced, that the conviction be introduced." The court stated that it was not what the person was convicted of that made the evidence probative. The court ruled without prejudice that the evidence of the conviction for sexual battery was not relevant. The court suggested that defense counsel research cases that might support his argument that the conviction for the lesser offense should be introduced. Counsel stated that perhaps he and the prosecutor could agree to a stipulation.

During her testimony, Yolanda stated that she had previously been to court in regard to the incident with defendant. No evidence was presented about the results of any proceedings against defendant. Defense counsel asked the court to take judicial notice that defendant had pleaded guilty to sexual battery against Yolanda and was given credit for time served and granted probation. The court stated the evidence was not relevant to the question at hand, which was whether or not defendant committed a rape of Yolanda. The fact that defendant pleaded guilty so as to avoid jail did not counter the prosecution's evidence that he committed a rape. Moreover, the evidence of the nature of the conviction would require instruction on the elements of sexual battery, since the jury would not know what that was.

The trial court told counsel that he could introduce the prior conviction to show that defendant committed sexual battery. Defense counsel insisted, however, that he wanted the conviction to come in for a different purpose, i.e., to inform the jury that defendant entered the plea to avoid trial.

### C. Relevant Authority

Only relevant evidence is admissible. (Evid. Code, § 350.) All relevant evidence is admissible, except as otherwise provided by statute. ( Evid. Code, § 351.) Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends 'logically, naturally, and by

reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" (*People v. Garceau* (1993) 6 Cal.4th 140, 177.) The trial court has wide discretion in determining the relevancy of evidence. (*Ibid*.) Evidence is irrelevant if it leads only to speculative inferences. (*People v. Morrison* (2004) 34 Cal.4th 698, 711.)

Where prior uncharged crimes evidence is admitted, a trial court must allow the defendant to present evidence of his acquittal. (*People v. Griffin* (1967) 66 Cal.2d 459, 465-466 (*Griffin*) [other crimes evidence admissible because of similarities between the crimes to show victim's injuries not accidental]; *People v. Mullens* (2004) 119 Cal.App.4th 648, 667 (*Mullens*) [other crimes evidence admitted under Evidence Code section 1108].) As *Griffin* explains, it is logical that competent evidence of another crime is not inadmissible by reason of the defendant's acquittal, but the proof of the acquittal is also admissible to weaken or rebut the prosecution's evidence of the other crime. (*People v. Jenkins* (1970) 3 Cal.App.3d 529, 534.) "Accordingly, the gist of the holding in *Griffin* is that since 'evidence of other crimes always involves the risk of serious prejudice, and it is therefore always "to be received with 'extreme caution,'"' [citation] any competent or otherwise admissible evidence tending to weaken and rebut the evidence of the other crime should be admissible." (*Ibid*.)

### D. No Abuse of Discretion or Error

At the outset, we note that the trial court stated it would allow defense counsel to present evidence of defendant's conviction for sexual battery against Yolanda. Counsel, however, insisted on presenting evidence of the terms of defendant's plea deal and his purported reason for taking the deal. As the trial court repeatedly stated, this evidence was not relevant to the issue of whether or not defendant committed the rape.

Defendant argues, however, that the principles pronounced in *Griffin* and *Mullens* extend to the situation in his case, i.e., that he pleaded to a lesser included offense of rape. He offers no authority to support his claim that this is so. As noted, *Griffin* recognized that evidence of other crimes always involves the risk of prejudice, and that evidence of an acquittal should be admissible to rebut the prosecution's evidence of the other crime. (*Griffin*, *supra*, 66 Cal.2d at p. 465.) An acquittal is relevant for this purpose because it

39

addresses a defendant's guilt or innocence. In the instant case, however, defendant's innocence of his conduct with Yolanda was not shown by the fact that he pleaded to sexual battery in order to avoid being incarcerated.

We also conclude that any failure to admit evidence of the defendant's plea was harmless under any standard. (*Chapman*, *supra*, 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at p. 836; see *Griffin*, *supra*, 66 Cal.2d at pp. 466-467 [error in excluding evidence of acquittal is reviewed under the standard in *Watson*].) As the trial court pointed out, evidence that defendant pleaded guilty to sexual battery could have led the jury to believe that defendant knew he was guilty and tried to avoid a conviction of the greater offense. Sexual battery is committed when the perpetrator touches an intimate part of an unwilling person "for the specific purpose of sexual arousal, sexual gratification, or sexual abuse." (§ 243.4, subd. (e)(1).) Therefore, defendant suffered no prejudice from the court's exclusion of the evidence and actually benefited from its exclusion, since it would have bolstered Yolanda's credibility.

**VIII. CALJIC No. 2.50.1**

### A. *Defendant's Argument*

Defendant contends that CALJIC No. 2.50.01, quoted in footnote 6 *ante*, which instructed the jury on the use of prior uncharged offenses, violates due process. It interferes with the presumption of innocence and makes conviction possible without proof beyond a reasonable doubt, calling for reversal of the convictions. He argues that, even under the *Watson* standard, reversal is called for because it is reasonably probable the jury misapplied the instruction in the instant case.

### B. *No Due Process Violation*

CALJIC No. 2.50.01 instructs the jury on the use of evidence admitted under Evidence Code section 1108. (See *Falsetta*, *supra*, 21 Cal.4th at p. 924.) The instruction states, in part, that the jury may infer that defendant "was likely to commit and did commit" the charged offenses if they find that he committed the prior offenses and infer that he had a disposition to commit sexual offenses. (CALJIC No. 2.50.01 (1999 rev.).) Defendant acknowledges that *People v. Reliford* (2003) 29 Cal.4th 1007 (*Reliford*) held

that the instruction correctly states the law and does not violate due process. (*Id.* at p. 1009.) He also acknowledges that this court is required to follow *Reliford*, and he states that he makes this argument for purposes of preserving the matter for federal review. He contends that *Reliford* is in error.

In *Reliford*, the prosecution presented evidence indicating the defendant previously had raped a different victim in a manner similar to the charged offense. The defendant claimed that, "having found the uncharged sex offense true by a preponderance of the evidence, jurors would rely on 'this alone' to convict him of the charged offenses." (*Reliford*, *supra*, 29 Cal.4th at p. 1013.) *Reliford* rejected the argument because the instruction specifically stated, "'if you find by a preponderance of the evidence that the defendant committed a prior sexual offense . . . , that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crime.'" (*Ibid.*) *Reliford* concluded, "[n]o reasonable juror would believe those requirements could be satisfied solely by proof of uncharged offenses." (*Id.* at pp. 1013-1014.) "[W]e will presume here that jurors can grasp their duty—as stated in the instructions—to apply the preponderance-of-the-evidence standard to the preliminary fact identified in the instruction and to apply the reasonable-doubt standard for all other determinations." (*Id.* at p. 1016.)

CALJIC No. 2.50.01 does not deny a defendant due process because it does not allow a jury to infer guilt without proof beyond a reasonable doubt. Moreover, the version of the instruction read to the jury was approved in *Schultz v. Tilton* (9th Cir. 2011) 659 F.3d 941, 945, as being consistent with clearly established federal law. We are satisfied beyond a reasonable doubt that the jury used the propensity evidence for a proper purpose, and that the verdict was not based on an interpretation by which the jury convicted defendant by a mere preponderance of the evidence.

## IX. Ineffective Assistance

Defendant states that if this court should conclude that any of the issues he presents are deemed forfeited, he alternatively asserts that trial counsel provided ineffective assistance by failing to preserve the issue. To successfully assert a claim of

ineffective assistance of counsel, a defendant must demonstrate that counsel's representations fell below an objective standard of reasonableness, and but for counsel's errors there is a reasonable probability that the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.) Since we have addressed the merits of all of defendant's arguments, no claim of ineffective assistance of counsel lies.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.